ELLISON, WHALEN & BLACKBURN
Attorneys at Law
KIRK BLACKBURN
State Bar No. 246582
PATRICK J. WHALEN
State Bar No. 173489
1201 K Street, Ste. 1960
Sacramento, CA 95814
Telephone: (916) 448-2187
Facsimile: (916) 448-5346
E-mail: attorneys@ellisonlawoffices.com

Attorneys for Plaintiff
Western States Trucking Association

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WESTERN STATES TRUCKING ASSOCIATION<br><br>     Plaintiff,<br><br>  vs.<br><br>ANDRE SCHOORL, Acting Director of the California Department of Industrial Relations; XAVIER BECERRA, Attorney General for the State of California, and DOES 1-50<br><br>     Defendants. | Case No. 2:18-cv-01989-MCE-KJN<br><br>**OPPOSITION TO MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:   Off calendar<br>Judge: :  Hon. Morrison C. England, Jr.<br>Action Filed: 7/19/2018 |

# TABLE OF CONTENTS

**INTRODUCTION** ................................................................................................ - 1 -

**ARGUMENT** ..................................................................................................... - 1 -

**I. THE COMPLAINT DEMONSTRATES AN ACTUAL CONTROVERSY WITHIN THE MEANING OF THE DECLARATORY JUDGMENT ACT** .................................. - 1 -

    A. Standard of Review ....................................................................................... - 2 -

    B. California Law and Procedure for Administering Wage Claims .................... - 3 -

    C. WSTA Members Have a Concrete Interest in the Immediate Determination of the Constitutionality of the ABC Test Announced in *Dynamex* .................................. - 4 -

**II. ALL THREE CAUSES OF ACTION STATE A COGNIZABLE CLAIM** ............... - 8 -

    A. Standard of Review ....................................................................................... - 9 -

    B. The FAAAA Preempts Wage Order No. 9 As Interpreted in *Dynamex* ........ - 9 -

    C. The Federal Motor Carrier Safety Regulations Preempt Wage Order No. 9 As Interpreted in *Dynamex* .............................................................................................. - 13 -

    D. The Rule in *Dynamex* Discriminates Against Interstate Trucking Companies That Operate Using Independent Contractors ....................................................... - 16 -

**III. WSTA HAS SUFFICIENTLY PLED ASSOCIATIONAL STANDING** ............... - 19 -

    A. General Requirements for Associational Standing ...................................... - 19 -

    B. WSTA Has Demonstrated Associational Standing ...................................... - 20 -

    C. IBT Has Failed to Establish A Requirement That Specific Members Be Identified .... - 21 -

    D. IBT's Statistical Analysis is Irrelevant ...................................................... - 24 -

**CONCLUSION** ................................................................................................. - 26 -

**TABLE OF AUTHORITIES**

**Cases**

*Aetna Life Insurance Co. v. Haworth,* 300 U.S. 227, 240-41 (1937) ........................- 3 -

*Alaska Airlines, Inc. v. City of Long Beach*, 951 F.2d 977, 983 (9th Cir. 1991.) ....................- 19 -

*Am. Trucking Ass'n, Inc. v. Michigan Pub. Serv. Comm'n*, 545 U.S. 429, 434 (2005)............- 18 -

*Am. Trucking Associations, Inc. v. Scheiner*, 483 U.S. 266, 286-287 .....................................- 17 -

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) .......................................................................- 9 -

*Baker v. Carr*, 369 U.S. 186, 198 (1962).............................................................................- 2 -

*Balistreri v. Pacifica Police Dep't.*, 901 F.2d 696, 699 (9th Cir. 1990) ....................................- 9 -

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) .........................................................- 9 -

*Brillhart v. Excess Ins. Co. of America*, 316 U.S. 491, 494 (1942) ..........................................- 8 -

*California Trucking Ass'n v. Su*, ___ F.3d ____,

   No. 17-55133, 2018 WL 4288953 (9th Cir. Sept. 10, 2018) .........................- 10 -, - 11 -, - 12 -

*California Trucking Association v. Su*, 2017 WL 6049242, at *3 (S.D. Cal. Jan. 6, 2017) .....- 12 -

*Californians for Safe and Competitive Dump Truck Transportation v. Mendonca*,

   152 F.3d 1184 (9th Cir. 1998) ..........................................................................................- 11 -

*Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010) ...................- 3 -

*City of New York v. FCC*, 486 U.S. 57, 64 (1988)................................................................- 13 -

*Colwell v. Department of Health and Human Services*, 558 F.3d 1112, 1121 (9th Cir.2009) ...- 3 -

*Conference of Fed. Sav. and Loan Ass'ns v. Stein*, 604 F.2d 1256, 1259 (9th Cir.1979)...........- 7 -

*Daniel v. County of Santa Barbara*, 288 F.3d 375, 380 (9th Cir.2002),

   cert. denied, 537 U.S. 973 (2002) ....................................................................................- 3 -

*Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008)...............................................- 17 -

*Dilts v. Penske Logistics, LLC*, 769 F.3d 637 (9th Cir. 2014) ................................................- 11 -

*Doe v. Schachter*, 804 F.Supp. 53, 56 (N.D.Cal.1992)..........................................................- 2 -

*Dynamex Operations West, Inc. v. Superior Court*, 4 Cal. 5th 903 (2018) ........................ passim

*Employers Ass'n, Inc. v. United Steelworkers of America*, 803 F.Supp. 1558, (D.Minn.1992) .- 7 -

*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982)...........................- 13 -

*First Fed. Sav. and Loan Ass'n of Boston v. Greenwald*, 591 F.2d 417, 423 (1st Cir.1979)......- 7 -

*Gov't Employees Ins. Co. v. Dizol*, 133 F.3d 1220, 1225 (9th Cir. 1998) ..................- 8 -

*Gritchen v. Collier,* 254 F.3d 807, 811 (9th Cir.2001) ..............................- 3 -

*Hunt v. Washington State Apple Advert. Comm'n,* 432 U.S. 333, 343 (1977)........................- 20 -

*Independent Towers of Washington v. Washington*, 350 F.3d 925, 930 (9th Cir.2003).............- 9 -

*Love v. United States*, 915 F.2d 1242, 1245 (9th Cir. 1989) ......................- 9 -

*Murphy v. Kenneth Cole Productions, Inc.*, 40 Cal.4th 1094, 1115 (2007) ..............................- 3 -

*N.L.R.B. v. North Dakota*, 504 F.Supp.2d 750, 753 (D.N.D.2007) ............................- 7 -

*National Council of La Raza v. Cegavske*, 800 F.3d 1032 (9th Cir. 2015) ..............................- 22 -

*Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001) ..............................- 9 -

*Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 180 (1995)..........................- 16 -

*Ouachita Watch League v. United States Forest Serv.*, 858 F.3d 539, 543 (8th Cir. 2017).....- 23 -

*Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970) ........................- 17 -

*R.J. Reynolds Tobacco Co. v. Durham Cty., N.C.*, 479 U.S. 130, 149 (1986) ........................- 13 -

*S. G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal. 3d 341 (1989) . - 10 -, - 24 -, - 25 -

*Schwann v. FedEx Ground Package Sys., Inc.*, 813 F.3d 429 (1st Cir. 2016)............... - 10 -, - 11 -

*Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC,*

    713 F.3d 175, 184 (4th Cir. 2013) ........................................- 23 -

*Specialized Carriers & Rigging Assoc. v. Com. of Va.*, 795 F.2d 1152, 1155 (4th Cir. 1986) - 15 -

*Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) .......................- 21 -, - 22 -, - 23 -, - 24 -

*Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) ........................- 2 -

*Warth v. Seldin*, 422 U.S. 490, 511 (1975) ..........................................- 19 -

*Wyeth v. Levine*, 555 U.S. 555, 576 (2009) ..........................................- 13 -

*Yellow Freight Sys., Inc. v. Amestoy*, 736 F. Supp. 44, 48 (D. Vt. 1990).....................- 14 -, - 15 -

*Yoder v. Western Express, Inc.*, 181 F. Supp. 3d 704, 721-23 (C.D. Cal. 2015).....................- 18 -

**Statutes**

28 U.S.C. § 1331 ..........................................................- 2 -

28 U.S.C. § 2201 ..........................................................- 2 -

49 U.S.C. § 13301 .............................................................................- 13 -

49 U.S.C. § 14102 .............................................................................- 13 -

49 U.S.C. § 14501 ...............................................................................- 1 -

Cal. Labor Code § 1194 .......................................................................- 3 -

Cal. Labor Code § 218 .........................................................................- 3 -

Cal. Labor Code § 226.8 ......................................................................- 4 -

Cal. Labor Code § 98 ...........................................................................- 3 -

**Other Authorities**

Analysis of SB 1402, *California Senate Committee on Appropriations* (May 7, 2018) ............- 6 -

**Rules**

Federal Rule of Civil Procedure 12(b)(1) .......................................- 1 -, - 2 -, - 7 -, - 8 -

Federal Rule of Civil Procedure 12(b)(6) ..............................................- 1 -, - 8 -

**Regulations**

49 C.F.R. § 376.11 .............................................................................- 14 -

49 C.F.R. § 376.12(c) .........................................................................- 14 -

49 C.F.R. § 376.2(e) ...........................................................................- 14 -

49 CFR § 1.87 ....................................................................................- 13 -

**Constitutional Provisions**

Article I Section 8 ................................................................................- 2 -

U.S. Const. Article III, § 2 ...................................................................- 2 -

Opposition to Motion to Dismiss

**INTRODUCTION**

Defendants have filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) and (b)(6).  Under Rule 12(b)(1), defendants are challenging subject matter jurisdiction, specifically contending that the complaint does not meet the "actual controversy" requirement under the Declaratory Judgment Act.  Under Rule 12(b)(6), defendants contend WSTA has failed to state a claim upon which relief can be granted.

Shortly before this opposition was due, proposed intervenor International Brotherhood of Teamsters ("IBT") submitted a brief in support of the motion to dismiss, styled as either a motion in its own right as a party should its request to intervene be granted, or as an amicus brief if this court denies permission to intervene.  (See ECF No. 16 and 16-1.)[1]  Plaintiff does not object to the filing of the brief as an amicus, and in the interest of judicial efficiency, will address the arguments of IBT in this opposition.

**ARGUMENT**

**I. THE COMPLAINT DEMONSTRATES AN ACTUAL CONTROVERSY WITHIN THE MEANING OF THE DECLARATORY JUDGMENT ACT**

The Complaint alleges that Wage Order No. 9, as interpreted in *Dynamex Operations West, Inc. v. Superior Court*, 4 Cal. 5th 903 (2018) ("*Dynamex*"), is preempted by federal law and is unconstitutional under the negative commerce clause.  (ECF No. 1 at 13-21, ¶¶ 42-75.)  The claims for preemption are premised on an act of Congress (the Federal Aviation Administration Authorization Act of 1994 codified at 49 U.S.C. § 14501 et seq.), and a series of regulations promulgated by the Federal Motor Carrier Safety Administration (codified in title 49, parts 300 to 399.)  Each preemption claim is based on the Supremacy Clause in Article IV of the

---

[1] Currently pending before this Court is IBT's Motion to Intervene (see ECF No. 8.), to which both plaintiff and defendants have filed opposition.  (See ECF Nos. 12 and 13.)

Opposition to Motion to Dismiss

U.S. Constitution.  The negative Commerce Clause claim is based on Article I Section 8 of the U.S. Constitution.  Thus, the complaint clearly raises federal questions.

Defendants' motion seems to be based on the argument that there is no imminent threatened government action sufficient to satisfy the actual controversy requirement.  (ECF No. 6 at 14-15.)  Defendants' argument must be rejected.

A. Standard of Review

Rule 12(b)(1) provides a procedural mechanism for a defendant to challenge subject-matter jurisdiction. "A jurisdictional challenge under Rule 12(b)(1) may be made either on the face of the pleadings or by presenting extrinsic evidence. Where jurisdiction is intertwined with the merits, we must assume the truth of the allegations in a complaint unless controverted by undisputed facts in the record." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) (internal quotation marks, brackets, ellipsis and citations omitted).  Defendants herein are making a facial challenge.  When the motion attacks the complaint on its face, often referred to as a "facial attack," the court considers the complaint's allegations to be true, and plaintiff enjoys "safeguards akin to those applied when a Rule 12(b)(6) motion is made." *Doe v. Schachter*, 804 F.Supp. 53, 56 (N.D.Cal.1992).

Presuming its factual allegations to be true, the complaint must demonstrate that the court has either diversity jurisdiction or federal question jurisdiction. For federal question jurisdiction, as alleged in this case, and pursuant to 28 U.S.C. § 1331, the complaint must either (1) arise under a federal law or the United States Constitution, (2) allege a "case or controversy" within the meaning of Article III, § 2, or (3) be authorized by a jurisdiction statute.  *Baker v. Carr*, 369 U.S. 186, 198 (1962).

The Declaratory Judgment Act permits federal courts to "declare the rights and legal obligations of an interested party '[i]n a case of actual controversy.'"  28 U.S.C. § 2201.

"A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests.

*Aetna Life Insurance Co. v. Haworth,* 300 U.S. 227, 240-41 (1937). While true that the Declaratory Judgment Act does not create an independent basis for jurisdiction, it does provide the court with subject matter jurisdiction where jurisdiction already exists. *Gritchen v. Collier,* 254 F.3d 807, 811 (9th Cir.2001). The nonmoving party bears the burden of establishing jurisdiction. *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010). A complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle [him] to relief. *Colwell v. Department of Health and Human Services*, 558 F.3d 1112, 1121 (9th Cir.2009) (quoting *Daniel v. County of Santa Barbara*, 288 F.3d 375, 380 (9th Cir.2002), cert. denied, 537 U.S. 973 (2002)).

B. California Law and Procedure for Administering Wage Claims

In California, if an employee believes that his employer has failed to pay wages in the amount, time or manner required by contract or by statute, the employee has two principal options. One option is for the employee to seek judicial relief by filing a civil action against the employer for breach of contract and/or for the wages prescribed by statute. Cal. Labor Code §§ 218, 1194. The other option is for the employee to seek administrative relief by filing a wage claim with the Labor Commissioner[2] pursuant to a special statutory scheme. Cal. Labor Code §§ 98 to 98.8.

Once an employee files a complaint with the Labor Commissioner, "the commissioner may either accept the matter and conduct an administrative hearing [citation], prosecute a civil action for the collection of wages and other money payable to employees arising out of an employment relationship [citation], or take no further action on the complaint. [Citation.]" *Murphy v. Kenneth Cole Productions, Inc.*, 40 Cal.4th 1094, 1115 (2007). Any hearing must be held within 90 days. Cal Labor Code § 98.

The Labor Commissioner is given specific statutory authorization to adjudicate claims of misclassification of employees as independent contractors, may adjudicate such claims in the

---

[2] The Labor Commissioner is Chief of the Division of Labor Standards Enforcement, a division of the Department of Industrial Relations. Cal. Labor Code §§ 79, 82.

Opposition to Motion to Dismiss

context of a wage claim, and may assess civil penalties of up to $25,000 for each violation, in addition to any other penalties or fines permitted by law. Cal. Labor Code § 226.8.

*Dynamex* adopted a new "A-B-C test" for determining whether a worker is an employee or independent contractor for purposes of the transportation industry wage order:

> Under this test, a worker is properly considered an independent contractor to whom a wage order does not apply only if the hiring entity establishes: (A) that the worker is free from the control and direction of the hirer in connection with the performance of the work, both under the contract for the performance of such work and in fact; (B) that the worker performs work that is outside the usual course of the hiring entity's business; and (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed for the hiring entity.

*Dynamex*, supra, 4 Cal.5th at 916-917. The new A-B-C test announced in *Dynamex* mandates that the "hiring entity" must prevail on all three prongs, to show that the "worker" is an independent contractor. *Id.* at 955. Failing to prevail on even one prong means that the "worker" will be considered an employee, even though the "worker" is an independent business. In the trucking business, and construction trucking in particular, both the "hiring entity" and the "worker" are independent trucking companies, and thus, a defendant in any action would almost certainly fail the B-prong of the test.

C. WSTA Members Have a Concrete Interest in the Immediate Determination of the Constitutionality of the ABC Test Announced in *Dynamex*

As alleged in the Complaint, WSTA has over 1,000 member companies and another 5,000 affiliated member motor carriers, and the members provide work for approximately 10,000 drivers, mechanics, support personnel and managers. (ECF No 1. at 2, ¶ 1.) Any of these workers could initiate a wage/misclassification claim against a WSTA member at any time. Alternatively, any independent owner-operator could initiate a claim against any other member for whom it performs subhauling work. The probability of such actions is not speculative. Indeed, in just one of California's 58 counties, at least seven class action lawsuits expressly

based on *Dynamex* were filed within the first three months following the *Dynamex* decision.[3] Note that this only includes those cases in which the *Dynamex* decision was expressly cited in the complaint. There may be dozens of other recently-filed lawsuits alleging misclassification without specifically citing *Dynamex*.

All of the defendants in the above-entitled actions are transportation companies covered by Wage Order No. 9. The flurry of complaints filed immediately following the *Dynamex* decision indicates that the threat of legal liability is quite real. In all of these cases, and any others that may be filed against motor carriers, the issue of preemption will loom large, and may be dispositive.

IBT in its amicus brief joins defendants in the argument that there is no genuine threat of imminent prosecution. (See ECF No. 16-1 at 10-11.) However, in its pleading, it argues there have been more than 1,150 separate cases alleging misclassification of drayage drivers as independent contractors since 2010. *Id*. at 9. According to the very analysis cited by IBT:

> Drayage services involve transporting goods (generally containers) a short distance via ground freight or the charge for such a transport. In freight forwarding, drayage is typically used to describe the trucking service from an ocean port to a rail ramp, warehouse, or other destination.

---

[3] *See Javiar Cortez, on behalf of himself and all others similarly situated, Plaintiff, v. Maplebear Inc. (d/b/a Instacart), Defendant.*, 2018 WL 2266685 (Cal.Super.) San Francisco County No. CGC-18-566596; *Matthew Talbot and Monica Garcia, individually and on behalf of all others similarly situated, Plaintiffs, v. Lyft Inc., Defendant.*, 2018 WL 2149279 (Cal.Super.) San Francisco County No. CGC-18-566392; *Manuel Magana, on behalf of himself and all others similarly situated, Plaintiff, v. Doordash Inc., Defendant.*, 2018 WL 2216206 (Cal.Super.) San Francisco County No. CGC-18-566404; *Raef Lawson, individually and on behalf of all other similarly situated, Plaintiff, v. Deliv, Inc., Defendant.*, 2018 WL 2322391 (Cal.Super.) San Francisco County No. CGC-18-566577; *Dora Lee, on behalf of herself and all others similarly situated, Plaintiff, v. Postmates, Inc., Defendant.*, 2018 WL 2149278 (Cal.Super.) San Francisco County No. CGC-18-566394; *Cynthia Marciano, Plaintiff, v. Doordash Inc., Defendant.*, 2018 WL 3329951 (Cal.Super.) San Francisco County No. CGC-18-567869; *Jacob Rimler, Plaintiff, v. Postmates Inc., Defendant.*, 2018 WL 3329949 (Cal.Super.) San Francisco County No. CGC-18-567868; *Geoffrey Waxler, on behalf of himself and all others similarly situated, Plaintiffs, v. Uber Technologies, Inc., et al.* 2018 WL 3057439 (Cal.Super.) San Francisco County No. CGC-18-567423.

Opposition to Motion to Dismiss

Analysis of SB 1402, *California Senate Committee on Appropriations* (May 7, 2018). As defined, drayage drivers comprise only a small portion WSTA's membership. In addition to drayage trucks, WSTA members operate many different types and classes of commercial motor vehicles, including dump trucks, concrete pumpers and mixers, water trucks, heavy-haul trucks, and class 8 over-the-road tractors." (See ECF No 1. at 2, ¶ 1.) If it is correct that there have been an average of 150 misclassification cases per year in the drayage truck community alone, then by definition there are an even larger number of cases impacting WSTA members, since the WSTA membership encompasses a much wider range of trucking. Accordingly, WSTA members accurately believe that they have been and will be targeted with misclassification claims in the very near future.

But even more significant than the notable increase in the frequency of litigation spurred by *Dynamex*, WSTA members have a concrete interest in knowing whether they need to dramatically change their business models in order to insulate themselves from liability in light of the new interpretation of California law. Every day that goes by results in continued potential liability. Members that are concerned about this potential liability may alter their business models but would then be at a competitive disadvantage given all of the costs and administrative requirements associated with employees as compared to independent contractors. Conversely, members that continue to use other trucking companies as independent contractors may be exposing themselves to increased penalties for "willful" violations of the law. The industry deserves to know whether the new law will apply to them notwithstanding federal law that expressly preempts states laws related to the price, route, or service of a motor carrier.

WSTA members routinely use multiple independent subcontractors as subhaulers. (See e.g., ECF No. 1 at 5-7, ¶¶ 14-15, 19-22.) Thus, they are either routinely in violation of state law, and subject to sanctions, or they are not because the state law is unconstitutional. Any action brought against WSTA members would be devastating, either because it would involve a class action with all the attendant damages and attorney fees, or because it would involve massive waiting time and other penalties assessed by the Labor Commissioner.

Courts have already recognized that a conflict between a state statute and federal regulations presents a justiciable controversy. See *Conference of Fed. Sav. and Loan Ass'ns v. Stein*, 604 F.2d 1256, 1259 (9th Cir.1979)(holding that conflicting positions taken by a state agency and a federal agency on the effect of a state statute created an actual justiciable controversy); *First Fed. Sav. and Loan Ass'n of Boston v. Greenwald*, 591 F.2d 417, 423 (1st Cir.1979) (providing that state and federal regulations currently in effect that subject the associations to conflicting requirements presents a justiciable controversy). In this case, the state's highest court has definitively interpreted state law, and the complaint alleges that that interpretation is in conflict with federal law, federal regulations, and the U.S. Constitution.

Courts have repeatedly found jurisdiction under the Declaratory Judgment Act in situations analogous to the instant case. For example, in *N.L.R.B. v. North Dakota*, 504 F.Supp.2d 750, 753 (D.N.D.2007), NLRB contended that a state law was in actual conflict with the National Labor Relations Act. The court found that an actual justiciable controversy was presented and that the jurisdictional requirements for a declaratory judgment action had been met under 28 U.S.C. § 2201. *Id*. at 754. Similarly, in another case in which Minnesota enacted a Striker Replacement Law, a group of employers sued contending the state law violated federal labor law. *Employers Ass'n, Inc. v. United Steelworkers of America*, 803 F.Supp. 1558, (D.Minn.1992), vacated 19 F.3d 405, vacated 23 F.3d 214, affirmed 32 F.3d 1297. In ruling on the defendants' motion to dismiss under Rule 12(b)(1), the court noted the enactment of the law altered the subtle balance between workers and employers by removing a weapon from the arsenal of the employer. The court held that "[t]his material alteration of the collective bargaining relationship obviates any need to await a strike and actual invocation of the law" and found a justiciable controversy and subject matter jurisdiction existed. *Id*. at 1563. In this case, the mere fact that there is no pending lawsuit against any WSTA members does not change the fact that the *Dynamex* decision alters the very nature of the relationship WSTA members have with each other. Accordingly, this court should find that there is an actual controversy.

To the extent defendants rely on this Court's discretion to hear this matter, the very case relied upon by defendants undermines their argument. (See ECF No. 6 at 15.) In *Gov't*

*Employees Ins. Co. v. Dizol*, 133 F.3d 1220, 1225 (9th Cir. 1998), the court observed that "there is no presumption in favor of abstention in declaratory actions generally." The court also identified the factors to be considered in exercising the Court's discretion including: (1) avoiding the needless determination of state law issues; (2) discouraging the filing of declaratory actions as a means of forum shopping; (3) avoiding duplicative litigation; (4) resolving all aspects of the controversy in a single proceeding if possible; (5) avoiding intervention unless the declaratory action will serve a useful purpose in clarifying the legal relations at issue; (6) avoiding procedural fencing or permitting one party to obtain an unjust res judicata advantage at the expense of the other; (7) avoiding entanglement between the federal and state court systems; and (8) avoiding jeopardizing the convenience of the parties. 133 F.3d at 1225–26 (citing *Brillhart v. Excess Ins. Co. of America*, 316 U.S. 491, 494 (1942).)

In this case, all of the factors militate in favor of finding jurisdiction. There is no requirement to determine any state law issues, as the *Dynamex* decision has already definitively pronounced state law in the area of misclassification of independent contractors. There is no evidence that any party is forum shopping. Moreover, a ruling on the claims presented may well minimize duplicative litigation, as the issue of preemption and commerce clause violations will be resolved at once for the entire trucking industry. This case can resolve all of the federal claims in this single discrete proceeding, and this court's ruling in the merits will undeniably serve a useful purpose in clarifying the legal relations at issue between WSTA members. Neither will this case result in an unjust res judicata advantage, entanglement with the state courts, or inconvenience to the parties. In short, it would be an abuse of discretion to decline to exercise jurisdiction in this case. Accordingly, defendants' motion to dismiss pursuant to Rule 12(b)(1) should be denied.

## II. ALL THREE CAUSES OF ACTION STATE A COGNIZABLE CLAIM

Defendants next argue that the various causes of action pled in the complaint fail to state a claim and should therefore be dismissed under Rule 12(b)(6). The issues raised in this case are

being hotly litigated around the country and no case has found them be subject to dismissal. For the reasons which follow, the motion must be denied.

A.  Standard of Review

Pursuant to Rule 12(b)(6), a complaint may be dismissed as a matter of law for failure to state a claim for two reasons: (1) lack of a cognizable legal theory; or (2) insufficient facts under a cognizable legal theory. See *Balistreri v. Pacifica Police Dep't*., 901 F.2d 696, 699 (9th Cir. 1990). In determining whether the pleading states a claim on which relief may be granted, its allegations of material fact must be taken as true and construed in the light most favorable to plaintiff.  See *Love v. United States*, 915 F.2d 1242, 1245 (9th Cir. 1989).  Dismissal "is proper only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). The complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

B.  The FAAAA Preempts Wage Order No. 9 As Interpreted in *Dynamex*

WSTA has alleged that the interpretation of Wage Order No. 9 in *Dynamex*, and the new A-B-C test announced by the court, is preempted by the Federal Aviation Administration Authorization Act of 1994 (the FAAAA) Specifically, the FAAAA provides:

> (1) General Rule. Except as provided in paragraphs (2) and (3), a State [or] political subdivision of a State ... may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier ... with respect to the transportation of property.

49 U.S.C. § 14501(c)(1).  The phrase "related to" in this general preemption provision is "interpreted quite broadly." *Independent Towers of Washington v. Washington*, 350 F.3d 925, 930 (9th Cir.2003).

The sole published case on point establishes that WSTA has pled a cognizable claim, yet that case is conspicuously absent from defendants' motion.  In *Schwann v. FedEx Ground*

*Package Sys., Inc.*, 813 F.3d 429 (1st Cir. 2016)[4] ("*Schwann*"), the court evaluated whether a Massachusetts statute that established a three-pronged test[5] that is virtually identical to the A-B-C test announced in *Dynamex* was preempted by the FAAAA. The court first observed that prong 2 (i.e. the "B" prong of the *Dynamex* test) would mandate that entities performing work that was not "outside the usual course of business" of the hiring entity would be deemed employees, and that that determination would require the employer to provide certain benefits applicable to employees. *Id*. at 433. After reviewing nearly a dozen United States Supreme Court cases regarding the scope of preemption under the FAAAA, *id*. at 435-437, the court found that prong 2 was "an anomaly" among state wage laws, that it ran counter to Congress' intent to avoid a patchwork of state laws, and that it was preempted under the FAAAA. *Id*. at 438-440.

The fact that a sister circuit has not only found WSTA's preemption claim cognizable, but meritorious, should be the end of the matter. But in a recent case, our own Ninth Circuit has also suggested that the claim may be meritorious. In *California Trucking Ass'n v. Su*, ___ F.3d ____, No. 17-55133, 2018 WL 4288953 (9th Cir. Sept. 10, 2018) ("*CTA*"), the court rejected the claim that the FAAAA preempted the old *Borello*[6] standard used in California for classifying workers as employees or independent contractors prior to *Dynamex*.[7] However, in so doing, the court addressed the opinion in *Schwann*, noting that its analysis might be different under a *Dynamex* test:[8]

---

[4] The case is listed in the defendants' table of contents, but does not appear in the body of its pleading. Compare ECF No. 6 at 5 with ECF No. 6 at 14,21.

[5] The relevant text of the Massachusetts Statute provides that "an individual performing any service ... shall be considered to be an employee" unless:

      (1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and

      (2) the service is performed outside the usual course of the business of the employer; and,

      (3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed. *Schwann*, *supra* at 433.

[6] *S. G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal. 3d 341 (1989).

[7] This case was decided after defendants filed their motion to dismiss.

[8] In a footnote, the court noted that the plaintiff had not sought relief under *Dynamex*. *CTA* at *3, n. 4. The court therefore expressly declined to address whether the A-B-C test of *Dynamex* would be preempted under the FAAAA. *Id*. at *7, n. 9.

Opposition to Motion to Dismiss

For similar reasons, it is immaterial that other States have adopted the "ABC" test to classify workers, the application of which courts have then held to be preempted. See *Schwann v. FedEx Ground Package Sys., Inc.*, 813 F.3d 429, 437 –40 (1st Cir. 2016) (analyzing Massachusetts law). Like *American Trucking*, the "ABC" test may effectively compel a motor carrier to use employees for certain services because, under the "ABC" test, a worker providing a service within an employer's usual course of business will never be considered an independent contractor. *Id.* at 438. For a motor carrier company, this means it may be difficult to classify drivers providing carriage services as independent contractors. *Id*. at 439. But California's common law test – as embodied in the *Borello* standard – is to the contrary. Whether the work fits within the usual course of an employer's business is one factor among many – and not even the most important one. See *Borello*, 256 Cal.Rptr. 543, 769 P.2d at 404. *CTA has not alleged or shown how the Borello standard makes it difficult for its members to use independent contractors to provide their services.*

*CTA* at *7, emphasis added. Not only has WSTA alleged that the *Dynamex* standard would make it difficult to use independent contractors, WSTA has alleged it would be impossible to do so. (See ECF No. 1 at 7, 13, 16 ¶¶ 22, 39, 57.) Accordingly, WSTA has pled more than the Ninth Circuit has indicated is required to state a preemption claim.

Rather than address the relevant case law, defendants instead rely on a series of cases that stand for the proposition that the FAAAA does not preempt "generally applicable background laws or regulations" that have only a tenuous effect on prices, routes, or services. (See ECF No. 6 at 9-11.) However, defendants ignore the fact that in this case, Wage Order No. 9 is not a rule of general applicability, but rather is *specifically aimed at and solely applies to the transportation industry*. (See ECF No. 1 at 8, ¶ 23.) Thus, it is unlike the prevailing wage laws at issue in *Californians for Safe and Competitive Dump Truck Transportation v. Mendonca*, 152 F.3d 1184 (9th Cir. 1998), which apply to all public works employees, and is unlike the meal and rest break laws in *Dilts v. Penske Logistics, LLC*, 769 F.3d 637 (9th Cir. 2014), which apply to all employees. Moreover, the wage order as interpreted by *Dynamex* has direct impacts on the prices, routes and services of WSTA members. (See, e.g., ECF No. 1 at 11, 12, 14, ¶¶ 34, 36, 45, 46.) Even if Defendants disagree that the reasoning of the First Circuit in *Schwann* or the

distinctions drawn by the Ninth Circuit recently in *CTA* compel a favorable determination for WSTA in this case, that is a matter for summary judgment, and is irrelevant at the pleading stage. Accordingly, defendants' argument that the FAAAA preemption claim should be dismissed must be rejected.

IBT joins in the argument that the FAAAA claim should be dismissed, advancing similar but slightly different arguments. (See ECF No. 16-1 at 11-19.) IBT's arguments do not aid defendants' position.

First, IBT relies on a quote from the unpublished district court decision in *California Trucking Association v. Su*, 2017 WL 6049242, at *3 (S.D. Cal. Jan. 6, 2017) for the proposition that "the ABC Test itself imposes no legal obligations. Rather, it merely 'determine[s] whether and how California's labor laws (which are not pre-empted by the FAAAA) apply to a worker.'" (See ECF No. 16-1 at 12.) The problem is that the portion of the lower court decision quoted by IBT has been impliedly rejected – or at least cast into serious question – by the published Ninth Circuit decision quoted above. *CTA*, *supra*, ___ F.3d ____, 2018 WL 4288953 at *7.

Second, IBT relies on *Dilts* and *Mendonca*, but fails to address the fact that in those cases, the Ninth Circuit's FAAAA analysis was premised on a state law of general application, rather than a wage order specific to the transportation industry. Indeed, the most recent pronouncement from the Ninth Circuit seems to suggest that the FAAAA analysis may well be different in light of *Dynamex*. *CTA*, *supra*, ___ F.3d ____, 2018 WL 4288953 at *7.

Third, IBT dismisses the Schwann case from the First Circuit by simply asserting that it is inconsistent with Ninth Circuit precedent. (See ECF No. 16-1 at 17.) However, IBT fails to acknowledge that none of the prior Ninth Circuit cases upon which it relies address the A-B-C test announced in *Dynamex* as applied to the transportation industry. IBT likewise fails to acknowledge that the Ninth Circuit has recently suggested that the FAAAA analysis may be different post-*Dynamex*. *CTA*, *supra*, ___ F.3d ____, 2018 WL 4288953 at *7. The fact that *Schwann* is directly on point as to the FAAAA claim in this case and the fact that the Ninth Circuit has clearly left the door open for a case with facts like those present in *Schwann* (and this case) means that WSTA has easily met the threshold for establishing a cognizable claim.

C.  The Federal Motor Carrier Safety Regulations Preempt Wage Order No. 9 As Interpreted in *Dynamex*

Defendants next argue that the third cause of action in the complaint also fails to state a claim and should likewise be dismissed.  (See ECF No. 6 at 29-23.)  However, the extant case law demonstrates otherwise.

Defendants acknowledge that federal agency regulations can preempt state laws under certain conditions, including when a state or local law conflicts with those regulations.  (See ECF No. 6 at 20, citing *Wyeth v. Levine*, 555 U.S. 555, 576 (2009), *City of New York v. FCC*, 486 U.S. 57, 64 (1988) and *R.J. Reynolds Tobacco Co. v. Durham Cty., N.C.*, 479 U.S. 130, 149 (1986).)  Defendants also do not appear to dispute the fact that federal law establishes the Federal Motor Carrier Safety Administration and gives it the authority to promulgate the Federal Motor Carrier Safety Regulations ("FMCSRs").  See 49 U.S.C. §§ 13301 and 14102; and 49 CFR § 1.87.  Rather, defendants appear to argue that the FMCSRs are not in conflict with state law.  This argument is untenable.

As an initial matter, it is important to note that "[f]ederal regulations have no less pre-emptive effect than federal statutes.  *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982) ("*Fidelity*").  In *Fidelity*, the high Court examined a federal banking regulation that permitted, but did not require, savings and loans to include a due on sale clause in home mortgage contracts.  *Id*. at 146.  The court granted certiorari on the question of whether the regulation preempted a California law that prohibited due on sale clauses.  *Id*. at 147-151.  In finding preemption, the Court focused on the conflict between the two laws, and noted that "[t]he conflict does not evaporate because the Board's regulation simply permits, but does not compel, federal savings and loans to include due-on-sale clauses in their contracts.  *Id*. at 155.  The Court did not require the savings and loan to show that it was impossible to comply with California law.  Rather, it was enough that the California law deprived the savings and loan of the flexibility it had under the regulation.  *Id*.

After *Fidelity*, lower courts have observed that the threshold for preemption of state law via regulation is not as high as defendants suggest.  "A federal regulatory scheme need

not require the employment of certain practices to preempt state law restrictions of those practices. Instead, it is enough that the regulations choose to permit the practices for preemption to occur." *Yellow Freight Sys., Inc. v. Amestoy*, 736 F. Supp. 44, 48 (D. Vt. 1990). Thus, if California's new rule regarding employee classification interferes with the FMCSRs, preemption will be found. *See International Paper v. Ouellette*, 479 U.S. 481, 494 (1987) ("[a] state law is ... pre-empted if it interferes with the methods by which the federal statute was designed to reach [its policy] goal").

The FMCSRs expressly contemplate that motor carriers will lease equipment and drivers to other carriers for the purpose of transporting property. The regulations state that an "authorized carrier may perform authorized transportation in equipment it does not own" under certain conditions, and specifically mandates that there be a written lease between the parties. 49 C.F.R. § 376.11. A lease is defined as "[a] contract or arrangement in which the owner grants the use of equipment, with or without driver, for a specified period to an authorized carrier for use in the regulated transportation of property, in exchange for compensation." 49 C.F.R. § 376.2(e), emphasis added. The lease "shall provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease." 49 C.F.R. § 376.12(c)(1). Notwithstanding that exclusive control, the regulations also provide:

> Nothing in the provisions required by paragraph (c)(1) of this section is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee. *An independent contractor relationship may exist* when a carrier lessee complies with 49 U.S.C. 14102 and attendant administrative requirements.

49 C.F.R. § 376.12(c)(4), emphasis added.

Thus, the regulations specifically contemplate that the parties to a lease may act as independent contractors, notwithstanding the "exclusive control" language that the lease is required to contain. However, under *Dynamex*, two motor carriers could never have an independent contractor relationship because they would necessarily fail at least the "B" prong of the A-B-C test, and would likely also fail the "A" prong (control) as well given the provisions of the lease. In other words, *Dynamex* removes the ability for contracting parties to maintain their

- 14 -

independent contractor status, and mandates that they form an employment relationship. The regulations thus permit a practice that state law prohibits, and is precisely the type of conflict that the United States Supreme Court and other lower federal courts have found to result in preemption.

There are many other instances in the FMCSRs in which the federal requirements permit or mandate certain practices in the context of lease arrangements which would trigger one or more of the A-B-C prongs, resulting in a determination that the independent contractor was in fact an employee under California law. (See, e.g., ECF No. 1 at 20, ¶¶72-73.) Again however, the FMCSRs expressly permit motor carriers to act as independent contractors with one another. 49 C.F.R. § 376.12(c)(4). Thus, the very types of independent contractor relationships permitted or mandated under the FMCSRs would be forced into the employer-employee designation under *Dynamex*.

IBT joins in defendants' argument that the FMCSRs do not preempt Wage Order No. 9, but adds little to the analysis. (See, ECF No. 16-1 at 19.) Essentially, IBT seems to echo defendants' argument that the FMCSRs were not intended to completely preempt all state regulation. Indeed, IBT correctly notes that in *Specialized Carriers & Rigging Assoc. v. Com. of Va.*, 795 F.2d 1152, 1155 (4th Cir. 1986), the court made clear that the Congress expressly left room for "supplementary state regulation." However, like defendants, IBT fails to address the fact that the construction of the wage order in *Dynamex* is not "supplementary," but rather in direct conflict with the FMCSRs. IBT fails to explain how a motor carrier could engage in the lease of a truck and driver to another carrier, consistent with the FMCSRs, and maintain an independent contractor relationship, while at the same time being necessarily deemed an employee by under *Dynamex*. It is irrelevant that the FMCSRs are safety regulations. What matters for purposes of preemption analysis is whether the federal regulation – regardless of how it is labeled – conflicts with or is frustrated by the state law. *Yellow Freight Sys., Inc. v. Amestoy, supra,* 736 F. Supp. at 48.

Accordingly, the claim that the FMCSRs preempt Wage Order No. 9 as interpreted by *Dynamex* is cognizable.

**D.  The Rule in *Dynamex* Discriminates Against Interstate Trucking Companies That Operate Using Independent Contractors**

The second cause of action in the complaint alleges that interstate trucking companies that operate in California will, under *Dynamex*, automatically have their independent contractor drivers reclassified as employees upon crossing the border, and will necessarily therefore incur prohibitive costs and/or will be forced to employ inefficient measures to carry out their trucking operations that go into and through California.   (See ECF No. 1 at 17-18, ¶61-66.)  Accordingly, *Dynamex* will impose an excessive burden on interstate commerce.  Defendants argue that Wage Order No. 9 is nondiscriminatory and even-handed in that it applies "equally to in-state, multi-state, and out-of-state employers within the state." (ECF No. 6 at 24.)  But that is precisely the point.  Wage Order No. 9, as interpreted by *Dynamex*, makes it impractical if not impossible for out-of-state and interstate trucking companies to operate within California because state law invalidates the use of independent contractor drivers.  California trucking companies that operate purely intrastate will be forced to convert to an all-employee model under *Dynamex*.  But out-of-state companies that still use the predominant independent contractor model will suddenly have to convert their drivers to employees whenever they cross into California.  It is the cost of that conversion that will create an excessive burden on interstate trucking companies.

As the Supreme Court has observed repeatedly, the purpose of the Commerce Clause is to "prevent[]a State from retreating into economic isolation or jeopardizing the welfare of the Nation as a whole, as it would do if it were free to place burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear." *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 180 (1995).  The Commerce Clause

> reflect[s] a central concern of the Framers that was an immediate reason for calling the Constitutional Convention:  the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation.

*Id.* at 480, citations and quotations omitted.    The Court has made clear that the Commerce Clause prohibits states from either discriminating against interstate commerce overtly or imposing laws that more subtly exert "an inexorable hydraulic pressure on interstate businesses to ply their trade within the State that enacted the measure rather than 'among the several States.'" *Am. Trucking Associations, Inc. v. Scheiner*, 483 U.S. 266, 286-287 (quoting U.S. Const., Art. I, § 8, cl. 3).

In a dormant Commerce Clause analysis, the court must inquire whether the challenged law discriminates against interstate commerce, in which case the law is virtually per se invalid, and survives only if it advances legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives. Absent discrimination against interstate commerce, the law is upheld unless the burden imposed on interstate commerce is clearly excessive in relation to putative local benefits. *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008).

> "If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities."

*Pike v. Bruce Church, Inc*., 397 U.S. 137, 142 (1970).  In such cases, the Court looks at the direct and indirect effects and burdens.  *Id*.

To be sure, *Dynamex* was not the first California case discussing the test for classifying workers as employees or independent contractors.  However, it is the first one to mandate that the primary business model used in interstate trucking, i.e. subhaulers who are also engaged in the same business as the overlying carrier, will almost certainly be deemed to be employees. Defendants' motion to dismiss does not identify any legitimate local purpose served by such a rigid, all-encompassing test.  But even if one could be identified, defendants' motion to dismiss is completely devoid of any balancing of the burdens that the new test imposes on interstate commerce and whether those burdens are outweighed by the putative local benefit.

Instead, defendants cite a Supreme Court case which simply held that a Michigan law which imposed a flat $100 fee on all trucking companies, both intrastate and interstate, was a de

minimis impact. *Am. Trucking Ass'n, Inc. v. Michigan Pub. Serv. Comm'n*, 545 U.S. 429, 434 (2005) (finding "little, if any, evidence that the $100 fee imposes any significant practical burden upon interstate trade"). Here, the impact on WSTA members will be far in excess of $100. They will either have to cease their operations in California altogether, incur substantial new costs and administrative compliance measures, or adopt alternative methods of delivering freight from the border to destinations within California. (See ECF No. 1 at 16-18, ¶¶ 58-64.) These significant burdens on interstate commerce are substantially different from the minimal $100 fee at issue in the *American Trucking* case relied upon by defendants, and that case does not compel dismissal of the claim prior to an analysis that weighs the relative benefits and burdens of the state law.

The defendants also cite *Yoder v. Western Express, Inc*., 181 F. Supp. 3d 704, 721-23 (C.D. Cal. 2015). In *Yoder*, the court was ruling on a summary judgment motion in which the defendant raised a dormant commerce clause challenge to California's meal and rest break laws. The court found that the defendant had provided "no analogous legal authority to support its claim that these burdens are 'clearly excessive' in relation to the legitimate public interest California has in regulating employment matters." *Id.* at 721. Thus, the court denied summary judgment and let the case proceed. However, a lone district court decision denying summary judgment due to the failure of a party to present sufficient legal authority is a far cry from mandating that a claim be dismissed at the pleading stage.

*Yoder* is distinguishable in its substance as well as its procedural posture. In *Yoder*, the defendant challenged California's meal and rest break laws which apply to all employees. Here, WSTA challenges only Wage Order No. 9, as recently interpreted by *Dynamex*. This order applies only to the transportation industry, and the new A-B-C test employed in California to classify workers as employees will excessively burden interstate trucking companies.

IBT does at least try to articulate some local benefit, pointing to the supposed benefits that Wage Order No. 9 affords to employees. (See ECF No. 16-1 at 21.) IBT's argument proceeds from the premise that people who have chosen to go into business for themselves, have purchased one or more trucks and trailers at a cost of tens if not hundreds of thousands of dollars, and have decided to be their own boss and build a business, instead want to be employees of

someone else.  The argument also overlooks the fact that published studies have shown that compensation of independent owner-operators is 40% higher than for employee drivers.  (See ECF No. 1 T 6, ¶ 16.)  Moreover, IBT fails to engage in any balancing of the putative benefit they claim; rather, IBT simply asserts that there is no substantial burden.  However, a state law that mandates that all workers in the same industry must be in an employment relationship despite the intentions of the parties and the actual facts of the relationship could fairly be described as "unreasonable or irrational."  *Alaska Airlines, Inc. v. City of Long Beach*, 951 F.2d 977, 983 (9th Cir. 1991.)

Accordingly, none of the authority cited by defendants establishes a basis to dismiss the dormant commerce clause claim.

### III.  WSTA HAS SUFFICIENTLY PLED ASSOCIATIONAL STANDING

Raising an argument not mentioned in the defendants' motion to dismiss Proposed Intervenor/Amicus IBT argues that WSTA has failed to establish associational standing sufficient to confer jurisdiction in this Court.  (See ECF No. 16-1 at 8-10.)  This argument lacks merit.

A.  General Requirements for Associational Standing

The Supreme Court has long recognized that "[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members."  *Warth v. Seldin*, 422 U.S. 490, 511 (1975).  In order to do so, the association "must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit."  *Id*. The requirements for associational standing have been summarized as follows:

> Thus we have recognized that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

Opposition to Motion to Dismiss

*Hunt v. Washington State Apple Advert. Comm'n,* 432 U.S. 333, 343 (1977).  With regard to the relief requested, the Court has noted

> If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind.

422 U.S., at 515.

### B.  WSTA Has Demonstrated Associational Standing

Under the test formulated by the Supreme Court, WSTA has associational standing.  First, there can be no doubt in this case that any individual member of WSTA could sue for declaratory and injunctive relief, since the new rule announced in *Dynamex* will impact virtually all WSTA members.  This is because virtually all WSTA members use independent contractor trucking companies to handle a workload that fluctuates dramatically.  (See, e.g., ECF No. 1 at 4-7, ¶¶ 6, 9, 10, 14, 15, 17, 19, 22.)  Thus, each member has an interest in knowing whether they are required to convert their business model to an employer-employee model, as a lawsuit could be filed against them at any time, and as businesses they need to be able to assess and manage risks.  Second, WSTA represents more than 1,000 member companies, including large fleet companies and small, one-truck independent owner operators, all of whom will be impacted if they are required to operate in an exclusively employer-employee model rather than the current independent contractor model, and thus, this case is clearly germane to the organization's purposes.  (See ECF No. 1 at 2, ¶ 1.)  Third, none of the claims asserted in this lawsuit require the participation of any individual WSTA members, because the questions presented are largely purely questions of law.  While WSTA will of course supply this court with documentary evidence and declarations to support the allegations in the complaint, the fact is that the preemption and commerce clause arguments will almost certainly involve the application of law to largely undisputed facts.  Since all trucking companies are, by definition, engaged in the same "usual course of business," the B-prong of the A-B-C test announced in *Dynamex* mandates an employment relationship whenever any WSTA member contracts with another trucking

company. The particular attributes of any individual member will be irrelevant to the question of whether an employment relationship mandated by state law is constitutional. Moreover, since the complaint seeks only declaratory and injunctive relief, the remedy sought is precisely the kind contemplated and authorized by the Supreme Court.

### C. IBT Has Failed to Establish A Requirement That Specific Members Be Identified

IBT eschews the well-established analytical framework for associational standing set forth above, and instead argues that WSTA has failed to identify a specific individual member that would suffer harm. (See ECF No. 16-1 at 8.) IBT cites *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) ("*Summers*") for the proposition that associational standing is only present when the complaint makes specific allegations establishing that at least one identified member had suffered or would suffer harm. In fact, the holding of *Summers* was not as broad as IBT claims, and subsequent cases have never applied it as rigidly as IBT urges.

It is worth noting the context of the Supreme Court's decision in *Summers*. The opinion begins with the observation that the organizations there sought

> to prevent the United States Forest Service from enforcing regulations that exempt small fire-rehabilitation and timber-salvage projects from the notice, comment, and appeal process used by the Forest Service for more significant land management decisions. We must determine whether respondents have standing to challenge the regulations in the absence of a live dispute over a concrete application of those regulations.

555 U.S. at 490. Thus, from the outset, the case was assessing standing in a case where there no live dispute over the application of the regulations. Indeed, the one concrete application of the regulations at issue involved a timber sale known as the Burnt Ridge project. However, that matter had been settled while the matter was pending in district court. *Id*. at 491. With the Burnt Ridge Project dispute resolved, there were "no other project[s] before the court in which respondents were threatened with injury in fact." *Id*. at 491-492. From that undeniably shaky ground for jurisdiction, the Court first noted that "the regulations under challenge here neither require nor forbid any action on the part of" the organizations asserting standing. *Id*. at 493.

- 21 -

The Court then observed that the sole affidavit submitted by a member alleging concrete harmed concerned the Burnt Ridge Project, which had already been settled. Thus, the Court declared:

> We know of no precedent for the proposition that when a plaintiff has sued to challenge the lawfulness of certain action or threatened action but has settled that suit, he retains standing to challenge the basis for that action

*Id*. at 494. The Court found that the organizations "have identified no other application of the invalidated regulations that threatens imminent and concrete harm to the interests of their members." *Id*. at 495. The Court then noted that the organizations were merely asserting procedural rights, (i.e. deprivation of the right to comment on the regulations) and noted that "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right in vacuo—is insufficient to create Article III standing." *Id*. at 496. Accordingly, the Court found that there was no Article III jurisdiction. *Id*. at 497.

It was only in the context of criticizing the dissent that the Court invoked the language quoted by IBT. The dissent maintained that there was a statistical probability that one or more members would be harmed by the regulations, and the majority opinion rejected that approach, referring to prior cases which had "required plaintiff-organizations to make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Id*. at 498.

The decision in *Summers* was thus a case where the organizations had failed to identify a concrete interest, but rather merely potential and speculative procedural interest related to other unidentified forest projects. However, in this case, WSTA has identified a concrete interest of all of its members in knowing whether the law as articulated in *Dynamex* requires them to completely restructure their business model.

Subsequent to the *Summers* case, the many circuits including our own Ninth Circuit have repeatedly found that no identification of specific members is required. For example, in *National Council of La Raza v. Cegavske*, 800 F.3d 1032 (9th Cir. 2015), the court rejected the interpretation of *Summers* that IBT urges in this case:

We are not convinced that *Summers*, an environmental case brought under the National Environmental Policy Act, stands for the proposition that an injured member of an organization must always be specifically identified in order to establish Article III standing for the organization.

*Id.* at 1041. The Ninth Circuit noted the speculative claims of the plaintiff in *Summers*, and held that

Where it is relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected by a defendant's action, and where the defendant need not know the identity of a particular member to understand and respond to an organization's claim of injury, we see no purpose to be served by requiring an organization to identify by name the member or members injured.

*Id.* Here, all WSTA members will be directly impacted by a new test that requires them to abandon entirely the use of independent contractor trucking companies and owner-operators in favor of employee drivers, or face severe financial liability for failing to do so. Neither IBT nor the defendants have indicated the need for identifying any particular member in order to respond to the predominantly legal claims asserted by the complaint.

Similarly, in *Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013), the court found that "*Summers* does retain a limited exception to its identification requirement for cases in which all members of an organization are harmed." See also *Ouachita Watch League v. United States Forest Serv.*, 858 F.3d 539, 543 (8th Cir. 2017) (Same). Even before *Summers* was decided, courts recognized that "[w]hen the alleged harm is prospective, we have not required that the organizational plaintiffs name names because every member faces a probability of harm in the near and definite future." *Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1160 (11th Cir. 2008)

Wage Order No. 9 applies to the transportation industry, and thus applies to all WSTA members. As interpreted in *Dynamex*, it will be impossible for WSTA members to contract with other trucking companies without establishing an employment relationship and bearing all the costs associated therewith. IBT acknowledges as much in its pleadings:

But nothing in *Dynamex* or Wage Order No. 9 precludes a motor carrier from hiring an independent owner operator for individual jobs or assignments.[9] Rather,

- 23 -

> *Dynamex* requires only that, if the ABC Test affords an owner-operator on an individual job the protections of Wage Order No. 9, the hiring entity pay the owner-operator in accordance with the Wage Order's minimum wage rules, provide the owner-operator with meal and rest breaks as required under the Wage Order, and reimburse the owner-operator for costs incurred in operating his or her truck during the job assignment (as well as abide by the other requirements of the Wage Order that are even more remotely connected to prices, routes, and services).

ECF No 16-1 at 16.  IBT's argument perhaps unintentionally proves the point that any time a WSTA member seeks to utilize another trucking company as a subhauler, all of the provisions of the Wage Order will be implicated.

Accordingly, it is a red herring for IBT to suggest that a particular WSTA member must be identified.  The basis for the action is the reality that all WSTA members will be impacted by the fundamental sea change in law announced by the California Supreme Court in *Dynamex*, unless that formulation is found unconstitutional by this Court.

D.  IBT's Statistical Analysis is Irrelevant

As a separate or additional basis for contesting associational standing, IBT makes a statistical argument that is both contradicted by the very Supreme Court precedent upon which it relies, and is manifestly irrelevant to the facts in the instant case.  IBT argues the California Department of Labor Standards Enforcement has adjudicated 1,150 misclassification complaints involving drayage drivers since 2010, and that 97% of those cases resulted in a finding that the hiring entity had misclassified the driver as an independent contractor under the *Borello* standard.  (ECF No. 16-1 at 9.)  From this premise, IBT argues that because the vast majority of the sampled cases resulted in a finding of misclassification under the old standard, WSTA will have difficulty showing that a member would be adversely impacted by the new more stringent standard.  *Id*. at 9-10.

There are several problems with IBT's argument.  First, it is the exact inverse of the type of argument that was rejected by the Supreme Court in *Summers*.  In *Summers*, quoted extensively in IBTs pleadings, the Supreme Court took pains to reject the dissent's reliance on statistical probabilities.  555 U.S. at 497-498.  Specifically, the majority decision noted:

Opposition to Motion to Dismiss

> The dissent proposes a hitherto unheard-of test for organizational standing: whether, accepting the organization's self-description of the activities of its members, there is a statistical probability that some of those members are threatened with concrete injury.

*Id*. at 497. Here, IBT proposes the exact same type of statistical analysis that was rejected in *Summers*, only to draw the reverse conclusion, i.e. that it is statistically unlikely that any WSTA member would fit into the sweet spot IBT identifies, i.e. surviving a misclassification claim under a *Borello* analysis but failing under a *Dynamex* analysis. Thus, the probability analysis proposed by IBT has been flatly rejected by the Supreme Court.

Second, even if it were to be considered, IBT's own analysis appears to contemplate that 3% of WSTAs members would fall into the sweet spot IBT describes. Since WSTA has thousands of members, it would necessarily follow from IBTs premise that a significant number of members would fall into the sweet spot. Third, the sweet spot defined by IBT is artificially narrow. It is not incumbent upon WSTA to demonstrate that its members would have prevailed under the old standard; all that is necessary is to demonstrate that the current version of California law is inconsistent with federal law.[9] It is of no moment that WSTA members might have had liability for misclassification under the *Borello* standard. At least under the old standard, they had a theoretical chance to prevail. Now, under the A-B-C test announced in *Dynamex*, it is a certainty that they will fail under at least one of the prongs. Fourth, and perhaps most significantly, the statistical sample of drayage drivers is of no relevance because WSTA members are comprised of thousands of members engaged in a variety of types of trucking. While drayage drivers may comprise a small portion of WSTA membership, IBT has failed to show that a sampling of the misclassification claims of drayage drivers has any relevance to the larger WSTA membership. In short, the statistical arguments offered by IBT are of no value in deciding the issues before this Court.

---

[9] Indeed, a complaint for declaratory relief regarding the prior articulation of state law before *Dynamex* would likely be dismissed as moot.

Opposition to Motion to Dismiss

## CONCLUSION

For the foregoing reasons, WSTA respectfully requests that the motion(s) to dismiss be denied.  In the alternative, WSTA requests leave to amend the complaint in the event this Court finds any deficiency in the pleading.

ELLISON, WHALEN & BLACKBURN

Dated:  September 20, 2018

/s/ Patrick J. Whalen

PATRICK J. WHALEN

Attorneys for Plaintiff
WESTERN STATES TRUCKING
ASSOCIATION